**DOERING, Plaintiff-Appellant, v. SOUTH EUCLID (City), Defendant-Appellee.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 25231.  Decided June 18, 1960.

Grace B. Doering, for plaintiff-appellant.

Clifford H. Bernard, Law Director, City of South Euclid, for defendant-appellee.

## OPINION

By SKEEL, J.

This appeal on questions of law and fact comes to this court from a decree and judgment entered for the defendant in the Court of Com-

mon Pleas after trial on the merits. The action is one seeking to enjoin the taking of private property by appropriation to be used in the construction of a "retention basin."

The City of South Euclid is a "Charter City." Under **Article XVIII, Ohio Constitution,** it possesses all powers of local self-government. The record shows that many residences of the city have experienced flooded basements and living quarters during heavy rains. The location of the city is such that some portions of its territory are subject to the natural flow of drain water from other municipalities to the south of its southerly border. The City of University Heights bounds the City of South Euclid along the center line of Cedar Road from South Green Road to the west. The Village of Beachwood bounds the rest of the southerly border of South Euclid to the east where its easterly border meets the westerly border of the City of Lyndhurst. The property said to be needed for the "retention basin" faces on both sides of Langerdale Boulevard (which runs on a curved line in a generally northerly and southerly direction at the bottom of a ravine), and begins at the intersection of Langerdale Boulevard and Laurel Hill Drive to the south and ends at the northerly end of Laurel Hill Drive as it again meets Langerdale Boulevard some eleven hundred feet to the north.

By ordinance passed June 22, 1959, the City Council of South Euclid declared in Section 1:

"That for the purpose of constructing and operating and maintaining storm water drains, sewers and a dam to divert the excess water from existing overflowing storm water sewers during heavy or prolonged rainfall into the natural retention basin formed by the valley existing along Langerdale Boulevard north of Cedar Road between Green Road and Laurel Hill Drive thereby relieving flooded basements, yards and buildings of residents of the City, this Council hereby determines that it is necessary and essential to the public peace, health, prosperity, welfare and safety of the community to appropriate the interests as herein designated in the land described below.

(a) **The fee simple right, interest and title in and to the** entirety described as:

Situated in the City of South Euclid, County of Cuyahoga, State of Ohio and known as being sublots Nos. 150, 159, 166, 167, 186 and 195A in the Belvoir Gardens Subdivision as recorded in Vol. 96, page 26 of the Cuyahoga County Records.

(b) The fee simple right, title and interest in and to parts of sublots as described below for construction, operation, maintenance and repair of the diversionary drains, sewers and dams:

Situated in the City of South Euclid, County of Cuyahoga and State of Ohio and known as being part of original Euclid Township Lot 32, Tract 3, and being parts of sublots Nos. 149, 151, 152, 153, 154, 155, 156, 157, 158, 162, 165, and 176 in the Belvoir Gardens Subdivision as recorded in Vol. 96, page 26 of Cuyahoga County Records. Each of the portions to be appropriated being described by metes and bounds as follows: * * *."

Then follows a complete description of that part of each of the sublots to be taken as shown on the map designated as Plaintiff's Exhibit 1—"Langerdale Retention Basin" prepared by H. P. Peterson, City

Engineer. The portion of the lots under (b) of the ordinance quoted, supra, comprises that part of each lot (and in some cases a little more) the surface level of which is (as shown on the map) at or below 1030 feet above sea level. Most of the lots, of which a part is taken, face to the west on the west side of South Green Road and to the east on the east side of Langerdale Boulevard. The plaintiff's lot (No. 149) will be separated from her neighbors to the south by the taking of all of sublot 150.

The city now owns all of the sublots (Nos. 187 to 195, inclusive) fronting on the west side of Langerdale Boulevard so that by the appropriation proceedings, if not enjoined, the city will become vested with a fee simple interest in all the property in the ravine facing on both sides of Langerdale Boulevard of sufficient depth to include all of the land, the surface of which is below 1030 feet above sea level from the point where it intersected Laurel Hill Drive on the south to the intersection of such thoroughfares on the north, a distance of about eleven hundred feet.

Langerdale Boulevard was dedicated as a public thoroughfare in the Belvoir Gardens Subdivision, October 29, 1924, and the plat thereof was approved and recorded March 3, 1926. There has been constructed within the limits of such "Boulevard" an eight inch water main, a ten inch sanitary sewer and a thirty-six inch storm sewer extending from Cedar Road to and in front of the properties described above "comprising ravine" and beyond to the north of the ravine to Belvoir Boulevard. There are no other improvements of any kind in that part of Langerdale Boulevard upon which all the properties above described abut. Within the ravine area of the property to be taken, as well as the city-owned lots, and including that part of the ravine shown on the map as a sixty foot boulevard, the surface of the ground is completely covered with underbrush and trees. Traffic on Langerdale Boulevard passes around the ravine area to the west over Laurel Hill Drive. There is no indication in the record that Langerdale Boulevard has ever been otherwise than an unkept area since it was dedicated for public use in 1926.

The proposal which the plaintiff seeks to enjoin deals with the city's purpose to control the flooding of basements and the inundation of homes occurring during heavy rain storms because of the inadequacy of the surface drainage sewer system in the areas affected. The "retention basin" is a part of an "overall" plan devised by the Engineering Department of the City of South Euclid to control flood waters in the city. The plan, by action of the City Council, was presented to the voters of the city and a bond issue of $900,000 was passed by the electors of the city to provide the funds necessary to carry the "overall" proposal into effect. Three hundred and ten thousand dollars of the amount voted by the people was estimated as the cost of the basic work for the "retention basin" to be constructed over that part of Langerdale Boulevard as above described.

The "retention basin" is to be constructed by building an earthen dam completely across Langerdale Boulevard just south of its intersection with Laurel Hill Drive beginning on Sublot 149 (that part of

Sublot 149 sought to be taken from the plaintiff) and ending on Sublot 186 directly across the boulevard to the west. The dam will be about thirty feet high from the lowest point or bottom of the ravine. The topographical markings on the map show that this part of the ravine is 998 feet above sea level while the southerly end of the basin at the southerly intersection of Laurel Hill Drive with Langerdale Boulevard is 1035 feet above sea level. It is proposed to divert all of the waters from a sixty inch surface water drainage sewer in Belvoir Boulevard at Cedar Road (permitting said drainage sewer to continue on north on Belvoir Boulevard to serve the residences of the territory) and a forty inch surface water sewer from the Mackall-Green area, including the waters from the south of the basin carried by the thirty-six inch surface water sewer in Langerdale Boulevard into the "retention basin." There will be a fifteen inch outlet at the base of the dam draining into the thirty-six inch surface water sewer in Langerdale Boulevard flowing to the north open at all times, which outlet has a maximum capacity of 32 cubic feet of water per second. There is to be an overflow outlet twenty feet above the lowest point of the dam, the top being at 1020 feet elevation and the overflow to be so constructed so that it will waste any overflow over the surface of Langerdale Boulevard north of the dam. The retention basin will have a capacity of over two million cubic feet of water when filled to the 1020 feet elevation and when so filled, the surface of the water will be 250 feet wide from bank to bank at its widest point. It will take 28 hours to empty the basin from its greatest capacity through the fifteen inch outlet into the surface water sewer in Langerdale Boulevard to the north of the dam. There will be a strip of concrete twenty feet wide from the beginning of the basin on the south to the dam to assist in the even flow of drain water and to prevent pools from forming at the bottom of the basin.

The purpose of the "retention basin" is to hold back flood stage water sufficiently long so that existing storm sewers will carry away surface waters without flooding the homes of the people in this territory. The evidence shows that it would cost over $3,000,000 to reconstruct a storm sewer on Belvoir Boulevard to accomplish the same purpose. This project is the result of the studied judgment of the City Council of the City of South Euclid. The evidence presented by the city supports the proposition that the proposed "retention basin" will become a very effective and an important part of the storm sewers of the city necessary to protect the health and safety of the people. There is no evidence to the contrary.

We come, therefore, to the plaintiff's claims—first, that the City has no constitutional right to take the described propery by eminent domain for the purposes declared by the ordinance above quoted; second, that the City abused its corporate power in authorizing the construction of the Langerdale Retention Basin; and third, that the ordinance authorizing the construction of a drain water retention dam by a municipality is in conflict with the general laws of the state.

**Article I, Section 19,** provides:

"Private property shall ever be held inviolate but subservient to the

public welfare. When taken in time of war or other public exigency, imperatively requiring its immediate seizure or for the purpose of making or repairing roads, which shall be open to the public, without charge, a compensation shall be made to the owner, in money; and in all other cases, where private property shall be taken for public use, a compensation therefor shall first be made in money, or first secured by a deposit of money; and such compensation shall be assessed by a jury, without deduction for benefits to any property of the owner."

**Article 18, Section 3, Ohio Constitution,** provides:

"Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."

**Article 18, Section 10, Ohio Constitution,** provides:

"A municipality appropriating or otherwise acquiring property for public use may in furtherance of such public use appropriate or acquire an excess over that actually to be occupied by the improvement, and may sell such excess with such restrictions as shall be appropriate to preserve the improvement made. Bonds may be issued to supply the funds in whole or in part to pay for the excess property so appropriated or otherwise acquired, but said bonds shall be a lien only against the property so acquired for the improvement and excess, and they shall not be a liability of the municipality nor be included in any limitation of the bonded indebtedness of such municipality prescribed by law."

The statute cited by plaintiff as being the one which is in conflict (authorizing the construction of the proposed retention basin project) is §719.01 R. C. It seems to be the contention of the plaintiff that because of **Article 18, Section 3, Ohio Constitution,** impowers municipal authorities to exercise all powers of local self-government and to adopt and enforce local sanitary and similar regulations not in conflict with general law, that the existing statutes in **Chapter 719 R. C.,** must specifically spell out the activities which are authorized under this section. **Sec. 719.01 R. C.,** in part provides:

"Any municipal corporation may appropriate, enter upon and hold real estate within its corporate limits; * * *.

"* * *(J) For sewers, drains, * * *."

Under the undisputed facts in this case, bearing in mind the purposes to be accomplished in the interest of the public health and safety, the proposed "retention basin" comes clearly within the terms "sewers and drains" as authorized under this section.

If the municipality is bound by this section, we find that there is no "conflict" as claimed by the plaintiff. However, this section is not a limitation on the rights of a municipal corporation in Ohio to appropriate and use private property for public use when such property has been determined by the municipality's legislative authority, in the reasonable exercise of its discretion, to be necessary for "public use." The Supreme Court has come to this conclusion in two recent cases. In the case of **State, ex rel. Gordon v. Rhodes, 156 Oh St 81,** 100 N. E. 2d 225, the City of Columbus was attempting to appropriate private property to pro-

vide for public off-street parking. The court held in the first three paragraphs of the syllabus:

"1. Under the home-rule amendments to the Constitution of Ohio (Section 3 et seq, Article XVIII, Ohio Constitution), an Ohio municipality, which has not adopted a charter provision to the contrary, has the power to acquire, maintain, and operate off-street facilities for the sole purpose of parking motor vehicles if the traffic conditions in such municipality are such as to warrant a determination by the legislative body of the municipality that the operation of such off-street parking facilities is necessary and that they will serve a public municipal purpose.

"2. The determination of what constitutes a public municipal purpose is primarily a function of the legislative body of the municipality, subject to review by the courts, and such determination by the legislative body will not be overruled by the courts except in instances where that determination is manifestly arbitrary or unreasonable.

"3. Where the acquisition, maintenance, and operation of off-street parking facilities by a municipality constitute the serving of a public municipal purpose, the municipality has the power under the Constitution of Ohio, without the aid of statutory enactment, to authorize and issue revenue bonds secured only by a mortgage upon those facilities and the revenues derived therefrom, and which bonds are not payable, either as to interest or principal, out of money derived from taxation."

Also in the case of State, ex rel. Bruestle v. Rich, 159 Oh St 13, 110 N. E. 2d 778, where the right of a municipality to acquire private property for urban redevelopment was upheld, the court said in the first three paragraphs of the syllabus:

"1. Where an urban redevelopment project contemplates the acquisition of property located in a slum area, the elimination of slum conditions in the area by clearing therefrom the buildings and making the land available for redevelopment and the subsequent sale of the land for redevelopment with restrictions as to its use which will insure against recurrence of slum conditions, and where such project apparently has its primary purpose the elimination of slum conditions and provisions against their recurrence, such project may involve a public use or purpose for which public funds can be expended and the power of eminent domain exercised.

"2. Under Section 19, Article I, Ohio Constitution, property taken for 'the public welfare' is regarded as property 'taken for public use.'

"3. Property may be taken for 'the public welfare' or 'for public use,' as those words are used in Section 19, Article I, Ohio Constitution, even though it is contemplated that there will at some future time be no use or right of use of the property taken on the part of the public or some limited portion thereof."

The legislative conclusion that the construction of a retention basin to hold back the sudden accumulation of surface waters due to heavy rains and to permit such accumulation to drain slowly into the sewer system of the city is necessary in the public interest and that the plan adopted will, in all reasonable probability, be sufficient to protect the people and their property, is well supported by the record. Cer-

tainly we cannot say that the adoption of the plan constituted an abuse of discretion.

For the foregoing reasons, a decree will be entered for the defendant as in the Court of Common Pleas.

HURD, PJ, KOVACHY, J, concur.